IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CLINTON FRANCE, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 12-268 |
| ) | |
| v. ) | Judge Cathy Bissoon |
| ) | |
| THE PNC FINANCIAL SERVICES ) | |
| GROUP, INC, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER**

**I. MEMORANDUM**

For the reasons that follow, Defendants' Motion to Dismiss (Doc. 22) will be granted.

**A. BACKGROUND AND PROCEDURAL HISTORY**

In this ERISA case, Plaintiff seeks to recover severance benefits from his former employer. *See generally* Am. Compl. (Doc. 20). Plaintiff was hired by National City Corporation ("NCC") in August 2007, and that company was acquired by PNC Financial Services Group, Inc. ("PNC"), effective December 31, 2008. *See* Am. Compl. at ¶¶ 7, 15-16; *see also* Defs.' Br. (Doc. 23) at 7 (identifying date of acquisition). Plaintiff's employment continued with PNC until March 15, 2009, when he took another job. *See generally* Am. Compl. at ¶ 21; *see also* Admin. Record (filed by Plaintiff under Doc. 26-1) at pg. 53 of 96. Plaintiff claims that he is entitled to severance pay under NCC's "Management Severance Plan" ("the Plan"), whose sponsorship and administration was carried on by PNC. *See* Am. Compl. at ¶¶ 9-10, 15; *see also generally* Plan (filed under Doc. 26-1 at pgs. 1 through 13 of 96).

Plaintiff sought severance benefits under the Plan, and his request was denied by the Plan administrator, after tiered review. This lawsuit resulted.

Defendants moved to dismiss Plaintiff's original Complaint and, in an Order dated August 21, 2012, the Court granted Plaintiff's request to amend his pleadings. Doc. 19. In so ruling, the Court noted that Defendants' arguments for dismissal were based, at least in part, on the merits of the Plan administrator's decision denying benefits. *See id.* at 2 n.1. The Court highlighted recent Third Circuit precedent implicitly approving the resolution of such issues at the 12(b)(6) stage, but determined that Plaintiff should, if he wished, have an opportunity to demonstrate why discovery was necessary for him to adequately oppose Defendants' motion. *Id.* at 2 & n.1 ("if Plaintiff believes that additional information is required . . ., [he] shall identify the discovery and/or additional information, if any, he believes is necessary, and provide legal authority in support of his position(s)"). The Court also suggested that the parties consider voluntarily exchanging information so that the Court might resolve their legal disputes without the expenses of discovery and mandatory ADR. *See id.* As a result, Defendants provided to Plaintiff the entire administrative record, and Plaintiff has placed it before the Court. *See* Doc. 26-1.

For the reasons stated below, Plaintiff has failed to convince the Court that his claims can be improved through discovery. Accordingly, the Court will resolve Defendants' Motion based on the information already provided, namely the contents of the Amended Complaint and the administrative record.

B. **LEGAL STANDARDS**

In this case, the Plan granted discretionary authority to the administrator to determine eligibility for benefits and to interpret the terms of the Plan. *See* Plan at Article 14 (Doc. 26-1 at pg. 12 of 96) (administrator "shall have full power and authority to interpret, construe and administer [the] Plan[,] and its interpretations and construction . . . shall be binding and conclusive on all persons for all purposes"). The administrator was a committee appointed by the board of directors of NCC, and later PNC. *See id.* at Article 2.2.1(b), (e).

Although neither party fleshes out the details, Plaintiff alleges, and the Court accepts for the purposes of the instant Motion, that the administrator operated under a potential conflict of interest, because the entity administering the Plan is the same, or related to, the entity paying benefits. *Cf. generally* Am. Compl. at ¶ 34(c) (alleging conflict of interest). Under the circumstances, Third Circuit precedent requires the Court to apply a "deferential abuse of discretion standard," under which the potential conflict of interest is treated "as one of several factors in considering whether the administrator . . . abused its discretion." *See* <u>Schwing v. Lilly Health Plan</u>, 562 F.3d 522, 525-26 (3d Cir. 2009).

The abuse of discretion standard, also referred to as the "arbitrary and capricious" standard of review, is a lenient one. *See generally* <u>Howley v. Mellon Fin. Corp.</u>, 625 F.3d 788, 792-93 & n.6 (3d Cir. 2010). An administrator's decision will be disturbed only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law. *Id.* (citation to quoted source omitted). Generally, the Court's review of the facts is limited to the information before the administrator, although discovery *may* be granted to investigate the degree to which a conflict of interest may have affected the decision-making process. *See id.* at 793-94.

In this case, Plaintiff was invited by the Court to make arguments, supported by legal citation, that would justify his further investigating the administrator's potential conflict of interest. His efforts are unconvincing, as Plaintiff merely highlights a number of trivialities that, viewed in light of the relevant legal analyses, are beside the point, red herrings or both. *See* discussions *infra* (rejecting Plaintiff's various arguments in opposition to Defendants' Motion). Conclusory allegations aside, Plaintiff has failed to identify *any* basis on which the Court reasonably may infer that the potential conflict of interest affected the administrator's decision. *See generally, e.g.,* Saddler v. Elliott Co., 2009 WL 4897742, *2 (3d Cir. Dec. 21, 2009) (affirming denial of benefits where "there [were] no facts of record – other than the potential conflict itself – that any potential conflict of interest influenced [the administrator's] decision").

Finally, even had Plaintiff made a better case for discovery, this point is immaterial because the Court would reach the same conclusion under a *de novo* review. *See* Caldwell v. PNC, 835 F. Supp.2d 510, 523 (S.D. Ohio Dec 19., 2011) (holding same in interpreting very same Plan at issue in this case); Doerschler v. PNC, Case No. 1:11cv443, at pg. 7 (W.D. Mich. Apr. 24, 2012) (same; "[t]he [c]ourt need not decide which standard of review applies," because administrator's "decision was proper under either").

## C. ANALYSIS

As to severance benefits, the Plan stated:

> 3.1 In the event [that PNC] terminates [Plaintiff's] employment during the Protection Period,[1] [Plaintiff] will be entitled to . . . severance compensation[, subject to certain exceptions not applicable here] . . . .

---

[1] Although the parties dispute whether or not Plaintiff's resignation in March 2009 fell within the Plan's "Protection Period," the Court's affirmance of the administrator's decision remains unaffected.

4

> 3.2 [Plaintiff] may terminate employment with [PNC] during the Protection Period <u>with the right to severance benefits</u> . . . <u>upon the occurrence of one or more of the following events</u> (regardless of whether any other reason for such termination exists or has occurred, <u>including</u> . . . <u>other employment</u>):
>
> (a) A reduction in [Plaintiff's] Base Salary; or
>
> (b) [PNC] . . . requires [Plaintiff] to have his principal location of work changed, to any location which is in excess of 50 miles from [his current work] location . . . .

*Id.* (Doc. 26-1 at pgs. 7 through 8 of 96) (emphasis added).

These are the only provisions addressing the payment of benefits for "termination," and Plaintiff does not claim that PNC reduced his base salary or relocated his workplace. Rather, Plaintiff argues that he was forced to "involuntarily resign" in March 2009, when he left PNC to work for another company. *See* Am. Compl. at ¶ 21.

Through multiple levels of review, the administrator consistently, and correctly, concluded that the Plan's language did not provide for benefits based on "involuntary" or "constructive" termination. The Plan contemplated payments: (i) if *PNC* discharged Plaintiff, or (ii) if *Plaintiff* terminated his employment, for reasons including the acceptance of other employment, but *only* if he was required to take a pay-cut or to relocate. Plaintiff's salary was not reduced, nor was he relocated. Rather, he continued his employment with PNC until March 2009, *when he accepted employment with another company*. Plaintiff's situation falls squarely under Article 3.2, and that Article simply does not allow for payment of severance benefits under the circumstances. Thus, even under a *de novo* review, the Court finds the administrator's reading to be correct.

This seemingly obvious conclusion notwithstanding, Plaintiff presses on with his "involuntary resignation" theory, claiming that he was being pushed out of the company and

5

highlighting NCC's/PNC's retention of an "outplacement" firm to assist him in finding new employment. *See* Am. Compl. at ¶¶ 18-19. Whether characterized as executive "coaching" (according to Defendant) or outplacement services (according to Plaintiff), Defendants did, indeed, provide Plaintiff with such assistance, apparently free-of-charge, and those services ultimately succeeded in helping him secure new employment. *See* Ltr. from Pl. dated Apr. 28, 2010 (filed under Doc. 6-2) ("[i]n partnership with [the outplacement firm], I secured a new [employment] opportunity").[2] Although Plaintiff, in his own mind, may have felt entitled to more, there simply is no basis for his receiving severance benefits under the Plan.[3]

---

[2] The administrative record contains detailed notes from the third-party-firm. *See* Doc. 26-1 at pgs. 49-52. The notes appear to show that, between Defendant's characterization of the services as executive "coaching," and Plaintiff's characterization of "outplacement services," the truth lies somewhere within. *See, e.g.*, notes dated 4/25/08 ("Met with [Plaintiff] for two hours to discuss how [we] can best assist [him] . . . He was very open to having [us] assist him."); 5/8/08 (Plaintiff was "[u]pbeat," things were "getting better in his work environment," and he was "very open to coaching"); 5/19/08 and 6/6/08 (Plaintiff investigating new positions within NCC, "[h]e is in good spirits"); 6/26/08 (Plaintiff "continues to make progress on all fronts," and is "moving in a positive direction as is [his] job search"); 7/21/08 (work "has been going okay and [is] problem free"); 9/17/08 (Plaintiff was interviewing with other companies, and "[w]ork is going very well, [there] still may be an internal position available"); 10/21/08 (Plaintiff waiting to hear regarding other opportunity, and meanwhile he had "begun [a] new position with [NCC]"); 11/6/08 (offer from new employer was forthcoming, "[NCC is] status quo and all is well"); 12/12/08 and 12/17/08 (although work at NCC had "slowed down project[-]wise due to PNC purchase," Plaintiff had two job offers forthcoming, and he "remain[ed] hopeful"); 1/28/09 (Plaintiff accepted new job offer, scheduled to start 2/15/09).

[3] Given the care and attention provided by the third-party firm, not to mention its success in helping him secure employment, Plaintiff's grievances may seem, to a neutral observer, somewhat bewildering. These same facts also may beg the question, what more could an employer, in the face of a "financial crisis" causing "rapid and chaotic shutdown[s]" in the industry, reasonably be asked to do? *Cf.* Pl.'s Ltr. dated Apr. 28, 2010 (filed under Doc. 26-1 at pg. 90 of 96) (acknowledging hardships in industry). In a world where "stuff happens," and in which others may not have fared so well in the wake of an industry meltdown, Plaintiff, apparently, would have demanded more. *See* Doc. 26-1 at pg. 26 of 96 (Plaintiff's email, complaining of home-real estate losses incurred through his acceptance of employment and relatively quick departure from NCC/PNC). Whether his feelings of entitlement were justified, or somewhat discourteous and petulant, the Plan offered him no salvation.

The Court's conclusion finds strong support in the law. In rejecting a materially similar argument, the Court of Appeals for the Third Circuit spoke plainly:

> Common sense teaches that as long as an employer offers to pay you tomorrow, you cannot get severance pay for quitting today. In other words, as long as you can come to work tomorrow and be paid for your time, you are not 'terminated' today.
>
> [The plaintiffs] have offered several arguments in an attempt to avoid both the language of the Plan and the common sense just alluded to. First, they contend that there was no further need for their services since [their workplace] had been effectively shut down. In essence, there was nothing for them to do, save playing golf in the afternoons. . . . As best we can determine, [the] plaintiffs' theory is that since this lack of work was the proximate result of the shutdown . . ., they were constructively discharged. In this context, we do not believe that being paid to do nothing is a working condition so intolerable as to constitute constructive discharge.

Henglein v. Colt Indus. Operating Corp. Informal Plan, 2004 WL 362297, *4 (3d Cir. Feb. 26, 2004) and Frank v. Colt Indus., Inc., 910 F.2d 90, 101 (3d Cir. 1990).

The reasoning in Colt Industries applies here with equal force. Nowhere does Plaintiff contend that he showed up for work and his employer refused to pay him. Regardless of whether PNC planned to, or ultimately would have, terminated his employment, the mere threat of that happening in the indefinite future does not warrant the payment of severance benefits. At least two other district courts have reached the same conclusion. *See* Caldwell, 835 F. Supp.2d at 523 (so holding, under same NCC/PNC Plan because, under doctrine of *expressio unius est exclusio alterius*, "[t]he fact that only two types of adverse employment actions are listed in § 3.2 indicates that the drafters of the Plan intended to exclude resignations due to other types of adverse employment actions," including purported involuntary/constructive discharge); Doerschler, at pg. 7 ("[n]otice of upcoming termination of [the plaintiff's] employment does not equate to termination for purposes of severance benefits").

7

These conclusions render moot many of the other arguments presented in the parties' motion papers, including Defendants' assertion that the Plan itself is the only proper Defendant. *Cf. generally* Defs.' Br. at 10-11. Also moot are Plaintiff's grievances regarding purported irregularities in the administrative process, as is his request for discovery. *Cf. generally* Pl.'s Opp'n Br. at 6-7 (complaining that initial determination of ineligibility was treated as first-level appeal, and that PNC manager who communicated to Plaintiff regarding denial of claim was not, herself, "the committee"). Defendants' Reply Brief provides convincing explanations for the perceived irregularities[4] and, in any event, his arguments fail on the merits and cannot be salvaged through further discovery.[5]

Likewise, the Court agrees with Defendants that Plaintiff's claim(s) for breach of fiduciary duty are duplicative of his claim for benefits under the Plan. At bottom, Plaintiff's fiduciary duty claims turn on the purported wrongful denial of benefits, and he seeks money damages on the same basis. *See* Am. Compl. at ¶ 41. The claims, therefore, are duplicative of his benefits claim, and they, too, will be dismissed. *See* <u>Cohen v. Independence Blue Cross</u>, 820 F.Supp.2d 594, 607-608 (D. N.J. Oct. 24, 2011) (collecting cases holding same); *see also* <u>Miller v. Mellon Long Term Disability Plan</u>, 721 F. Supp.2d 415, 423-24 (W.D. Pa. Jun. 25,

---

[4] *See, e.g.*, Defs.' Reply Br. (Doc. 28) at 1-2 & n.1; *see also id.* 4-5. The administrative record, read in whole, confirms that Plaintiff's claims received adequate consideration.

[5] The Court also rejects Plaintiff's flirtation with the concept that his termination occurred when NCC was acquired by PNC. *Cf.* Pl.'s Opp'n Br. at 14-17 (arguing that PNC's acquisition of NCC could be "a triggering event [for payment] under the severance benefit plan").
This assertion is fatally inconsistent with Plaintiff's averment that he was "involuntarily terminated" in March 2009, when he accepted other employment. *See* Am. Compl. at ¶ 21.
It is undisputed that Plaintiff remained an employee of, and drew compensation from, PNC after the acquisition. Plaintiff's shifting theories regarding his termination date only serve to further emphasize the folly of his position, because it is impossible, with intellectual honesty, to pin down a *de facto* termination date in the face of Plaintiff's continued employment until March 2009. The Court is disinclined to indulge legal theories once they degenerate into a strategy of, "say anything to win."

2010) (rejecting as duplicative plaintiff's attempt to assert "a claim for benefits [veiled] in equitable language").[6]

Finally, Plaintiff's claim for attorney's fees fails because, under both the Plan and ERISA, he is required to, but cannot, show some degree of success on the merits. *See* Plan at Article 5.6; Hardt v. Reliance Std. Life Ins. Co., 560 U.S. 242, 130 S. Ct. 2149, 2158 (2010).

D. **CONCLUSION**

For all of the reasons stated above, Defendants are entitled to dismissal of all of Plaintiff's claims. The Court, therefore, enters the following:

II. **ORDER**

Defendants' Motion to Dismiss (**Doc. 22**) is **GRANTED**, and Plaintiff's case is **DISMISSED WITH PREJDUICE**.[7]

IT IS SO ORDERED.


June 26, 2013                                    s\Cathy Bissoon
                                                 Cathy Bissoon
                                                 United States District Judge

cc (via ECF email notification):

All counsel of record

---

[6] Even if Plaintiff somehow could assert a claim for breach of fiduciary duty, the Court would deny such a claim, as a matter of law, for the reasons otherwise expressed above.
[7] As is obvious from the Court's analysis, the shortcomings of Plaintiff's claims cannot be cured by amendment.

9